IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

FIFE M. WHITESIDE,                    *
Trustee in Bankruptcy,

        Plaintiff,                     *

vs.                                    *
                                              CASE NO: 4:07-CV-87 (CDL)
                                       *
INFINITY CASUALTY INSURANCE CO.,
f/k/a ATLANTA CASUALTY CO.,            *

        Defendant.                     *

_____

O R D E R

This case arises from the alleged failure of Defendant Infinity Casualty Insurance Company to settle a claim against its insured, Lucio Zeferino-Anaya.  Presently pending before the Court are (1) Defendant's Motion for Summary Judgment (Doc. 75); (2) Plaintiff's Motion for Partial Summary Judgment (Doc. 76); (3) four motions in limine to exclude expert testimony (Docs. 98, 102, 103 & 104); (4) Defendant's Motion to Strike (Doc. 106); and (5) Defendant's Motion for Leave to File Amended Answer (Doc. 107).  For the following reasons, the Court rules as set forth below.

BACKGROUND

## I.    The Underlying Accident

On July 15, 2000, Zeferino Lucio-Anaya was driving a vehicle insured by Defendant Infinity Casualty Insurance Company ("ICIC"). Lucio-Anaya had been drinking, crossed the center line, and collided with the vehicle occupied by Vesta Majors and her daughter, Debra

1

Hanson. Ms. Majors was killed in the collision, and Ms. Hanson was also seriously injured.[1]

Bicente Aguilera Moreno was riding in the passenger seat of the car driven by Lucio-Anaya. Moreno suffered permanent brain damage and was left in a coma. It is undisputed that the vehicle driven by Lucio-Anaya was insured by ICIC and provided bodily injury coverage with a limit of $15,000 per person and $30,000 per accident. (Pl.'s Statement of Undisputed Material Facts [hereinafter, Pl.'s SOMF] ¶ 2; Def.'s Resp. to Pl.'s SOMF ¶ 2.)

## II. ICIC's Attempted Settlement Negotiations

ICIC litigation claims representative Shanda Barnes was assigned to the claims brought by the injured parties, including the claim brought by Moreno against Lucio-Anaya (the "Underlying Claim"). Barnes knew that Moreno's injuries were very serious; Ed Frerichs, an ICIC litigation manager, confirmed the seriousness of Moreno's injuries and that ICIC's insured, Lucio-Anaya, was clearly liable for the collision. (Pl.'s SOMF ¶¶ 3, 4; Def.'s Resp. to Pl.'s SOMF ¶¶ 3, 4.) By mid-August of 2000, ICIC determined that the Underlying Claim should be settled by a payment of the policy limits, $15,000. (Pl.'s SOMF ¶ 6; Def.'s Resp. to Pl.'s SOMF ¶ 6.) Barnes also knew that because Moreno was in a coma, a Georgia Probate Court would have to appoint a guardian to handle his affairs. (Pl.'s SOMF ¶ 7; Def.'s Resp. to Pl.'s SOMF ¶ 7.)

---

[1]Lucio-Anaya was convicted of vehicular homicide and is currently serving his sentence.

On August 23, 2000, attorney Noah Rosner of the firm Perales, Fernandez and Rosner, LLP, wrote to Barnes requesting that ICIC tender the policy limits to settle any claim Moreno might have against Lucio-Anaya. Barnes agreed, and she requested that ICIC issue a $15,000 check made out to Elsa Ramirez, Moreno's presumptive guardian, and Rosner's law firm. (Pl.'s Ex. 10.) Barnes, however, held the check and noted in her claims file that she had to wait to conclude any settlement until Rosner provided Moreno's guardianship paperwork. (Pl.'s Ex. 2 at Whiteside 00192.) The file for the Underlying Claim languished for nearly a year and a half.[2] During this time, Rosner also left Perales, Fernandez and Rosner.

On March 18, 2002, Moreno's father, Martin Aguilera, was appointed as Moreno's guardian. Attorney Ralph Perales, another attorney at Rosner's former firm, was retained to represent Aguilera. On March 21, 2002, Perales called Barnes and left her a message requesting that she return his call so they could discuss settlement of the Underlying Claim. Barnes admits receiving the message, but she did not return Perales's call. (Pl.'s SOMF ¶ 14; Def.'s Resp. to Pl.'s SOMF ¶ 14.) On April 3, 2002, Perales left Barnes another message, again requesting that she return his call so that they could discuss settlement. Barnes also admits receiving this message, but

---

[2] Rosner testified that establishing a guardianship "was not a priority with the family. The family believed that Bicente was going to come out of the coma and be fine . . . so a guardianship was not set up for a long period of time." (Rosner Dep. 55:19-25, Sept. 26, 2007.)

she again declined to return Perales's call. (Pl.'s SOMF ¶ 15; Def.'s Resp. to Pl.'s SOMF ¶ 15.)

On April 8, 2002 Perales wrote a letter to Barnes regarding settlement of his client's case (the "April 8 Letter"). The letter read:

> I am following up on my telephone messages to you of March 21 and April 3 concerning the above-referenced matter. I would like to bring this file to a resolution if possible. According to our file notes, you tendered the policy limits of $15,000 to settle this matter back in August of 2000, when you were dealing with Noah Rosner. Mr. Rosner has left this firm, and I have taken over this file.
>
> As you may remember, my client Mr. Aguilera went into a comma [sic] as a result of the brain injuries he received in this automobile collision and has remained in a comma [sic] since then. Enclosed is an Order from Fulton Probate Court recently appointing Martin Aguilera, Bicente's father, as his guardian.
>
> In reviewing the file, I did not see any declaration of coverage showing the limits of coverage held by Mr. Zeferino at the time of the collision. I would appreciate it if you could send me the coverage information so that I can confirm to Mr. Aguilera the extent of coverage, and so that we may then proceed to accept your offer of settlement which has been pending for quite sometime [sic].
>
> I am looking forward to your prompt response.

(Pl.'s Ex. 5.) Perales contends that Barnes failed to respond to his letter; Barnes contends that she received the letter on April 8th and left Perales a phone message which he failed to return. (See Pl.'s Ex. 6; Def.'s Resp. to Pl.'s SOMF ¶ 24.) Barnes also contends she believed she had already settled the case with Rosner, and she was just waiting on the guardianship papers to conclude the settlement. (Barnes Dep. 117:7-14, Sept. 13, 2007.)

4

On May 21, 2002, Perales sent a demand letter for the policy limits (the "May 21 Letter"). Perales requested a response in writing and a certified copy of the declaration of coverage by 5:00 p.m. on May 27, 2002, which was also Memorial Day. (Pl.'s Ex. 6.) Although there is some evidence that the May 21 Letter was addressed inaccurately, it is undisputed that ICIC received the letter in its mailroom on May 23, 2007. (Def.'s Statement of Undisputed Material Facts ¶ 30; Pl's Resp. to Def.'s Statement of Undisputed Material Facts ¶ 30.) No representative of ICIC responded to the May 21 Letter within the time limit specified by Perales; in fact, Barnes testified that she did not even receive the May 21 Letter until well after the deadline to respond had expired. (*See* Barnes Dep. 81:4-15.) ICIC admits that it did not inform Lucio-Anaya of Perales's communications at the time these communications occurred.[3] (Pl.'s SOMF ¶¶ 47, 48; Def.'s Resp. to Pl.'s SOMF ¶¶ 47, 48.)

## III. The Underlying Action

On June 12, 2002, Perales filed a lawsuit on behalf of Aguilera against Lucio-Anaya in the State Court of Cherokee County, Georgia (the "Underlying Action"). On June 27, 2002, Perales sent ICIC another demand letter (the "June 27 Letter"). The June 27 Letter

---

[3]ICIC argues that Lucio-Anaya was incidentally informed of Perales's alleged settlement offers in other communications; however, none of these communications occurred contemporaneously with Perales's settlement-related communications. (*See* Exs. L, P, & I to Def.'s Mot. for Summ. J.) ICIC also contends that it warned Lucio-Anaya that his personal assets could be in jeopardy in the event of an excess judgment and that he could secure his own counsel to represent his interests, (Ex. L to Def.'s Mot. for Summ. J.), although Plaintiff contends Lucio-Anaya never received this letter.

mentioned that ICIC failed to respond to two previous telephone messages and two letters seeking settlement, and it demanded two million dollars to settle the Underlying Action. (Pl.'s Ex. 19.) Barnes admitted she received the June 27 Letter but did not respond, and she believed she did not have authority to respond to a claim in excess of policy limits. (Barnes Dep. 96:15-98:10.)

On July 12, 2002, Barnes retained the firm Decker, Hallman, Barber and Briggs ("Decker Hallman") to represent Lucio-Anaya in the Underlying Action.[4] Attorneys Stacy Edelstein Hyken and Winston Briggs assumed responsibility for Lucio-Anaya's defense. Hyken reviewed the claims file, and she immediately e-mailed Barnes to ask whether Barnes had responded to Perales's April 8 Letter; Barnes replied that she had apparently received the April 8 Letter but never responded. (Pl.'s Ex. 60 at 1-2.)

Briggs and Hyken took the position that Rosner and Barnes reached a settlement agreement in 2000, that Barnes believed the settlement was concluded at that time, and that Barnes was simply waiting on the guardianship paperwork to finalize the settlement. Hyken attempted to offer Aguilera the policy limits several times, but Aguilera refused to settle; in fact, Hyken offered the policy

_____

[4]At some point during the Lucio-Anaya litigation, Decker Hallman also represented ICIC in a lawsuit against another law firm based on ICIC's claim that the firm had a conflict of interest, breached its fiduciary duties, and committed fraud. (Pl.'s SOMF ¶ 55; Def.'s Resp. to Pl.'s SOMF ¶ 55.) Briggs and ICIC (formerly Atlanta Casualty Company) also had a fairly extensive professional relationship. (*See* Pl.'s Ex. 92 (email from Briggs indicating that he had "handled over 600 cases for ACC/Infinity")).

limits even after ICIC exhausted the available bodily injury coverage by settling the claims of other injured parties. (*See, e.g.*, Def.'s Statement of Undisputed Material Facts ¶¶ 40, 41, 48.)

Hyken filed a motion to enforce the original Rosner settlement in Cherokee County State Court. In support of the motion, Hyken drafted and filed affidavits for herself and Barnes. ICIC admits that these affidavits were inaccurate. (Pl.'s SOMF ¶ 59; Def.'s Resp. to Pl.'s SOMF ¶ 59.) Absent from the affidavits was any specific mention of the April 8, May 21, or June 27 Letters. (*See generally* Pl.'s Exs. 12 & 13.) Barnes's affidavit stated that she had received only one message from Perales regarding settlement in April of 2002 and that she heard nothing further from Perales until he filed the Underlying Action in July of 2002. (Barnes Aff. ¶ 4, Aug. 8, 2002; *see also* Hyken Aff. ¶ 5, Aug. 19, 2002.) In addition, both Barnes and Hyken averred that they did not know Aguilera had been appointed as Moreno's guardian until the Underlying Action had been filed, despite the fact that Perales mentioned this fact in the April 8 Letter.[5] (Barnes Aff. ¶ 5; Hyken Aff. ¶ 6.)

On October 3, 2002, Cherokee County State Court Judge Clyde J. Grober, Jr. conducted a hearing regarding ICIC's motion to enforce

---

[5]The April 8 Letter states, "Enclosed is an Order from Fulton Probate Court recently appointing Martin Aguilera, Bicente's father, as his guardian." (Pl.'s Ex. 5.) The record also contains evidence indicating that Barnes informed Hyken that her affidavit contained some inaccuracies. (*See, e.g.,* Pl.'s Ex. 68.)

the Rosner settlement.  After the hearing, Hyken wrote a letter to
Judge Grober, which reads in relevant part:

> As you stated at the hearing, if [Aguilera] refused to
> accept the settlement offer made on Defendant's behalf, you
> would issue an order denying Defendant's Motion, but would
> include "Findings of Fact" that would serve to "nullify"
> any claim for bad faith against the insurance company in
> the future.
>
> . . .
>
> Please accept this letter as a request that the Court issue
> an Order reflecting its "Findings of Fact" as the Court
> indicated it would do on October 3, 2002 if it became
> necessary to issue an order in this case.  Should the Court
> wish, I would be happy to submit a proposed order to that
> effect.

(Pl.'s Ex. 70 at 1-2.)  In an order dated December 12, 2002, Judge
Grober denied the motion to enforce settlement on the basis that
Rosner did not have the authority to bind Moreno—who was
incapacitated and without a guardian—to any settlement agreement.
(Def.'s Ex. H to Mot. for Summ. J.)  Judge Grober did not mention
"bad faith" in his order, although he did state that "[t]he delay in
completing the steps to finalize the case appear to be the
responsibility of the person representing the Plaintiff Moreno."
(*Id.*)

After the entry of the order denying the motion to enforce
settlement, Perales dismissed the state court case and refiled it in
the Superior Court of Cherokee County.  At some point, Joaquin Coello
was substituted for Aguilera as Moreno's guardian.  Hyken filed
another motion to enforce the Rosner settlement in the superior

court, but the motion was also denied.[6]  The Underlying Action went to a jury trial, which resulted in a judgment against Lucio-Anaya of eight million dollars, $767,337.51 in prejudgment interest, and costs of the action.

## IV.  The Presently-Pending Action

On May 15, 2007, Plaintiff Fife M. Whiteside, as trustee in bankruptcy, brought the presently-pending action on behalf of Lucio-Anaya.  Plaintiff asserts claims for (1) negligent and/or bad faith failure to settle the Underlying Action; (2) breach of fiduciary duty; (3) breach of duty to provide a competent defense; and (4) fraud.  Plaintiff also seeks punitive damages and attorney fees.

DISCUSSION

## I.    Motion for Leave to File Amended Answer

ICIC seeks leave to file an amended answer which would assert the affirmative defenses of assumption of the risk, contributory negligence, and failure to avoid the consequences.  The Federal Rules of Civil Procedure provide that "[a] party may amend its pleading once as a matter of course . . . before being served with a responsive pleading[.]"  Fed. R. Civ. P. 15(a)(1).  After a responsive pleading has been filed, "a party may amend its pleadings only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  A "court should freely give leave when

_____

[6]ICIC unsuccessfully appealed the trial court's denial of the motion to enforce settlement.  *See Anaya v. Coello*, 279 Ga. App. 578, 581, 632 S.E.2d 425, 428 (2006).

justice so requires." *Id.* However, "trial courts have broad discretion in permitting or refusing to grant leave to amend." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006). A court may deny leave to amend "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2006) (per curiam).

ICIC's memorandum in support of its motion focuses on the relatively liberal amendment standard contemplated by Rule 15; however, because ICIC's motion was filed *after* the deadline set forth in the Court's scheduling order, ICIC "must first demonstrate good cause under Rule 16(b) before [the Court] will consider whether amendment is proper under Rule 15(a)." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1419 (1998) (per curiam); *see also* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Permitting a party to rely upon the standard set forth in Rule 15 to amend a pleading "would render scheduling orders meaningless and effectively would read Rule 16(b) and its good cause requirement out of the Federal Rules of Civil Procedure." *Sosa*, 133 F.3d at 1419. The "good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." *Id.* at 1418.

In this case, not only has ICIC failed to address whether good cause in fact exists, it also fails to explain how the scheduling order could not be met despite ICIC's diligence. ICIC filed its motion to amend on April 2, 2008, three months after the December 30, 2007 deadline set forth in the scheduling order. ICIC's motion to amend comes nearly four months after the close of the extended discovery period and more than a month after the parties filed their motions for summary judgment. Additionally, ICIC's motion to amend is based on its contention that Lucio-Anaya refused to cooperate with his lawyers throughout the Underlying Action. This conduct, and presumably the affirmative defenses related to such conduct, was known to ICIC well before the expiration of the time for filing its motion. *See Sosa*, 133 F.3d at 1419 (finding a lack of diligence, in part, because "the information supporting the proposed amendment . . . was available to [the party seeking the amendment] even before she filed suit"). Because ICIC has proffered no explanation as to why it could not comply with the Court's scheduling order and because it has not demonstrated its diligence in preserving its rights, the Court cannot find that ICIC's motion to amend is supported by good cause. *See, e.g., id*. Accordingly, ICIC's motion to amend is denied.

ICIC also argues that because Plaintiff had actual notice of its affirmative defenses, the purpose of the rule requiring the pleading of affirmative defenses is fulfilled. Thus, Plaintiff will suffer no prejudice if the affirmative defenses are raised at trial. Federal Rule of Civil Procedure 8(c)(1) provides that "[i]n responding to a

pleading, a party must affirmatively state any avoidance or affirmative defense[.]" Generally, a party's failure to plead an affirmative defense results in a waiver of that defense at trial. *See, e.g., Hassan v. U.S. Postal Svc.*, 842 F.2d 260, 263 (1988). However, "[t]he purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." *Id.* Thus, "[w]hen a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice," and when the plaintiff does not suffer any prejudice, a district court may hear evidence relating to the affirmative defense at trial. *Id.; see also Bergquist v. Fid. Info. Svcs., Inc.*, 197 F. App'x 813, 815-16 (11th Cir. 2006) (finding that district court did not abuse its discretion by hearing evidence of affirmative defense when plaintiff "clearly was on notice" that the affirmative defense "was a central issue of dispute between the parties").

ICIC clearly raised the issues of assumption of the risk, contributory negligence, and failure to avoid the consequences in its response to Plaintiff's motion for partial summary judgment, (Def.'s Resp. Mem. of Law in Opp'n to Pl.'s Mot. for Partial Summ. J. 13-14), and Plaintiff responded to these allegations, (Pl.'s Reply to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. 9-10). ICIC therefore argues that waiver is not appropriate because Plaintiff was advised "by some other means" that the affirmative defenses would be at issue

in this case. *See, e.g., Sweet v. Sec'y, Dep't of Corr.*, 467 F.3d 1311, 1322 n.4 (11th Cir. 2006) (observing that "our cases interpreting Federal Rule of Civil Procedure 8(c), which is applicable here, support a liberal approach to waiver"). However, as previously noted, ICIC waited until after the *extended* period for discovery had closed, after the scheduling order deadline, and after both parties filed their motions for summary judgment to raise its affirmative defenses. *Cf. Sweet*, 467 F.3d at 1322 n.4 (finding that defendant did not waive affirmative defense by raising it in a summary judgment motion, but motion was filed only thirty-six days after its first pleading and defendant still could have amended answer as a matter of course). Moreover, ICIC does not rebut Plaintiff's contention that it will be prejudiced by ICIC's assertion of these defenses, as Plaintiff will be required to reopen discovery and redepose witnesses to adequately explore the defenses. *Cf. Bergquist*, 197 F. App'x at 815 (finding affirmative defenses properly asserted before the court, but noting that the case "revolve[d] around" the defense and that the defense was "a focal point of the parties' Discovery"). Under these circumstances, the Court finds that ICIC has waived the affirmative defenses of assumption of the risk, contributory negligence, and failure to avoid the consequences.

## II. Motions in Limine to Exclude Expert Testimony

### A. General Principles of Admissibility

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that "a witness qualified as an expert by

knowledge, skill, experience, training, or education" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. When applying this rule, the trial court serves as a gatekeeper and may admit expert testimony only where it is both relevant and reliable. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "District courts are charged with this gatekeeping function 'to ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)). The proponent of the expert bears the burden of showing by a preponderance of the evidence that the proffered expert testimony is admissible. *See Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

The language of Rule 702 imposes three specific restrictions on the admissibility of expert testimony: qualification, reliability, and assistance. First, to qualify to testify as an expert, a witness must possess specialized expertise based on knowledge, skill, experience, training, or education. *See* Fed. R. Evid. 702. Although

14

an expert is not required to have personal knowledge of the facts at issue in the case, *see* Fed. R. Evid. 703, he must be qualified "regarding the matters he intends to address." *Allison*, 184 F.3d at 1309. Second, "the methodology by which the expert reaches his conclusion [must be] sufficiently reliable . . . ." *Id*. The proffered testimony must be "supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 590). The Supreme Court has provided a non-exclusive list of factors to assist in determining whether an expert's opinion is reliable: "(1) whether the theory or technique can be tested; (2) whether it has been subjected to peer review; (3) whether the technique has a high known or potential rate of error; and (4) whether the theory has attained general acceptance within the scientific community." *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 593-94). Finally, the expert testimony must "fit" the case, meaning the testimony must be relevant to the issues at hand and assist the trier of fact in resolving those issues. *See Frazier*, 387 F.3d at 1262-63. If the testimony addresses issues within the understanding and experience of an average citizen, it is not considered helpful to the jury and is properly excluded under Rule 702. *Id*. Put differently, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*.

B.  Analysis of Proposed Expert Testimony

    *1.  Plaintiff's Motion to Exclude Testimony of J. Robert Persons*

Plaintiff seeks to partially exclude the testimony of Professor J. Robert Persons.  ICIC designates Professor Persons as an expert who will "testify as to the claim handling conducted by [ICIC] in attempting to resolve" the claims at issue in this case.  (Def.'s Resp. Mem. of Law in Opp'n to Pl.'s Mot. to Partially Exclude Expert Test. of Professor J. Robert Persons 1.)  Plaintiff contends that Professor "Persons' testimony relating to what he believes the law is or should be and what the outcome of this case should be based on that law[] is improper and should be excluded."  (Pl.'s Mot. to Partially Exclude Expert Test. of J. Robert Persons 7.)  The Court agrees in part and finds that Professor Persons's expert testimony will be limited to the reasonableness of ICIC's claim handling practices in this case.

The Court first finds that Professor Persons is qualified to render an opinion on appropriate claims handling practices. Professor Persons is a lawyer with nearly thirty-five years' experience in insurance defense and coverage issues, and he is currently an adjunct professor of insurance law at the University of Georgia School of Law.  Professor Persons's experience also includes approximately ten years as counsel for Lloyd's of London.  While serving in this capacity, Professor Persons's responsibilities included claims management and underwriting recommendations,

responsibilities similar to those of a claims manager in the United States. In addition, Professor Persons is the co-author of a treatise on excess liability and is a certified mediator and arbitrator focusing on mediation of insurance coverage disputes. (*See generally* Attach. A to Ex. 1 to Def.'s Resp. Mem. of Law in Opp'n to Pl.'s Mot. to Partially Exclude Expert Test. of Professor J. Robert Persons.)

The Court also finds that Professor Persons's testimony is reliable. Professor Persons testified that he "constantly" updates his excess liability treatise, which requires him to survey both national and local trends in excess liability, including bad faith litigation and presumably, related claims-handling issues. (Persons Dep. 87:5-10, Feb. 19, 2008.) Professor Persons has also authored articles relating to guidelines for claims handling, coverage disputes, and bad faith litigation. (*See* Attach. A to Ex. 1 to Def.'s Resp. Mem. of Law in Opp'n to Pl.'s Mot. to Partially Exclude Expert Testimony of Professor J. Robert Persons.) In addition, Professor Persons bolstered his opinions by referring to another treatise on claims handling. (Persons Dep. 96:25-97:2.) The Court therefore finds that Professor Persons's knowledge and practical experience regarding claims handling issues renders his testimony

sufficiently reliable to withstand scrutiny under the second *Daubert* prong.[7]

Finally, the Court finds that Professor Persons's testimony will be helpful to the jury, as lay jurors are not likely to be familiar with the intricacies of insurance claims handling. Of course, although "[a]n expert may testify as to his opinion on an ultimate issue of fact[, a]n expert may not . . . merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (1990) (citing Fed. R. Evid. 704). The Court also recognizes that "[d]omestic law is properly considered and determined by the court whose function it is to instruct the jury on the law; domestic law is not to be presented through testimony and argued to the jury as a question of fact." *United States v. Oliveros*, 275 F.3d 1299, 1306-07 (11th Cir. 2001) (finding that district court did not abuse its discretion in excluding the expert testimony of a lawyer hired to explain visa and immigration procedures). Thus, to the extent Professor Persons's opinions merely describe what the law is or tell the jury what result to reach, they are inadmissible.

---

[7]Plaintiff points out that at one point in his deposition, Professor Persons testified, "I don't think industry standards govern my opinions in this case. My opinions in this case are based on my assessment as a lawyer of whether or not there was bad faith here based on what I understand the law to be in Georgia." (Persons Dep. 87:13-17.) Professor Persons's testimony at trial will not encompass legal conclusions, such as the existence of bad faith. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005) (experts are not permitted to offer legal conclusions). In addition, the Court is convinced, despite this isolated piece of deposition testimony, that Professor Persons's testimony regarding the reasonableness of the claims handling in this case is reliable.

18

However, Professor Persons will be permitted to offer his expert opinion as to whether ICIC acted reasonably in handling the Underlying Claim. Accordingly, Plaintiff's Motion to Partially Exclude Expert Testimony of J. Robert Persons is granted in part and denied in part.

>    2.    *ICIC's Motion to Exclude Testimony of Dr. Tim Ryles*

ICIC seeks to limit the expert testimony of Dr. Tim Ryles. Plaintiff offers Dr. Ryles as an expert in claims handling and the standard of care in the insurance industry as applied to the facts of this case. ICIC "seeks to limit the opinion testimony of Dr. Ryles, as it pertains to legal conclusions, since application of facts to the law are properly left to the province of a jury." (Def.'s Mot. in Limine to Limit Expert Witness Test. of Dr. Tim Ryles 2.) More specifically, ICIC contends that Dr. Ryles's opinions regarding (1) whether O.C.G.A. § 1-3-1(d)(3) gave ICIC until May 30, 2002 to respond to the May 21 Letter and (2) whether ICIC's failure to communicate with Lucio-Anaya in Spanish constituted "a reckless disregard for [Lucio-Anaya's] rights and welfare" should be excluded. (*See* Ex. 1 to Def.'s Mot. in Limine to Limit Expert Witness Test. of Dr. Tim Ryles 13, 19.) The Court agrees in part. Dr. Ryles will be permitted to testify as to whether ICIC's claims handling conduct, including ICIC's failure to communicate with its insured in Spanish, was reasonable.

First, the Court finds that Dr. Ryles is qualified to render an opinion regarding ICIC's claims handling in this case. Dr. Ryles is a former Commissioner of Insurance for the state of Georgia, and he has also served in various capacities for the National Association of Insurance Commissioners. During his tenure as Insurance Commissioner, Dr. Ryles was responsible for administering the laws and regulations governing insurers in the state of Georgia. For the last twelve years, Dr. Ryles has served as a consultant and expert witness in consumer protection and insurance matters. Dr. Ryles's main focus is on "market conduct," which includes claims and underwriting. (Ex. 1 to Def.'s Mot. in Limine to Limit Expert Witness Test. of Dr. Tim Ryles 2.)

The Court also finds that Dr. Ryles's testimony is reliable. In addition to Dr. Ryles's practical experience, Dr. Ryles's report reveals that he is well-versed in the industry and regulatory standards governing insurer conduct. In addition to reviewing the relevant deposition testimony and exhibit evidence in this case, Dr. Ryles referred to numerous texts regarding insurance claims handling practices. (*Id.* at 4-5.)

Finally, the Court finds that Dr. Ryles's expert testimony regarding the reasonableness of ICIC's claims handling will assist the jury for the same reasons the Court found Professor Persons's testimony would be helpful. Of course, the same limitations that apply to Professor Persons's testimony will apply to Dr. Ryles's

testimony. For example, the question of whether O.C.G.A. § 1-3-1 has any application in this case is a question of law, and thus Dr. Ryles's opinion that the statute applies is an inadmissible legal conclusion. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1112 n.8 (11th Cir. 2005). Subject to these limitations, Dr. Ryles will be permitted to offer his expert opinion as to whether ICIC acted reasonably in handling the Underlying Claim. Therefore Defendant's Motion in Limine to Limit Expert Witness Testimony of Dr. Tim Ryles is granted in part and denied in part.

   *3. ICIC's Motion to Exclude Testimony of Ben Philips*

  Plaintiff proffers attorney Ben Philips as an expert to testify "solely on the issue of the reasonableness of the Plaintiff's attorneys' fees." (Pl.'s Notice of Partial Withdrawal of Expert Testimony of Ben B. Philips, Esq. 1.) While ICIC acknowledges that Mr. Philips is a distinguished plaintiff's attorney, ICIC argues that Mr. Philips's testimony regarding the reasonableness of Plaintiff's attorneys' contingency fee in this particular case is inadmissible. Specifically, ICIC contends that Mr. Philips is not qualified to render such an opinion and that he reaches his conclusions without establishing the factual predicate therefor. Mr. Philips proposes to testify that

> [o]n the plaintiff's claim for attorneys fees and expenses, it is my opinion that a contingency fee of 40% to 50% is reasonable in a lawsuit such as this taking into account the quality of the plaintiff's lawyers, the quality of the

> defendant's lawyers, the resources of the insurance
> company, the amount of litigation costs and work for the
> Plaintiff's lawyers involved in this case, and the
> risks/vagaries of the litigation climate.

(Ex. 1 to Def.'s Mot. to Exclude Witness Test. of Ben Philips ¶ 3g.)

Mr. Philips's deposition, however, focuses primarily on his qualification to testify as an expert in insurance law and legal ethics, and Plaintiff is no longer offering Mr. Philips's testimony for these purposes. Thus, Mr. Philips's deposition fails to reveal the factual basis for his opinion that a forty to fifty percent attorney fee is reasonable in this particular case. For example, Mr. Philips had not yet examined any time records to ascertain "the amount of . . . work for the Plaintiff's lawyers involved in this case." (*Id.*) At best, one of Plaintiff's attorneys told Mr. Philips that he had "put hundreds of hours" into the case, but "[n]othing specific." (Philips Dep. 46:17-47:13, Feb. 20, 2008.)

It is apparent to the Court that Mr. Philips is qualified to offer an opinion as to the reasonableness of attorney's fees in general. Mr. Philips has been practicing law in Columbus, Georgia for thirty-two years, and currently he is a sole practitioner specializing in personal injury, medical negligence, product liability, federal tort claims, and consumer cases. Mr. Philips has tried over 100 cases to verdict as lead counsel and currently serves as counsel of record in numerous class action cases, including several insurance-based class actions. He is a current member of the American Association for Justice and the Georgia Trial Lawyers

22

Association, past Regional Vice President of the Georgia Trial Lawyers Association, and past President of the Chattahoochee Bar Association. He has also presented lectures on various trial practice topics. In light of the fact that Mr. Philips's deposition focused primarily on opinions not before the Court, the Court will defer ruling on the motion to exclude Mr. Philips's testimony until a *Daubert* hearing is held during which the Court can explore the factual basis for Mr. Philips's opinion.

4. *ICIC's Motion to Exclude Testimony of Patrick Longan*

Finally, ICIC seeks to exclude the expert testimony of Professor Patrick Longan. Plaintiff tenders Professor Longan's testimony regarding "alleged violations of the Georgia Rules of Professional Conduct, including conflict of interest, breaches of the duties of loyalty and communication, and the breach of candor, on the part of" Briggs and Hyken. (Def.'s Mot. to Exclude/Limit Expert Witness Test. of Patrick Longan 2.) In light of the Court's ruling in section III.B.2 of this Order, the Court cannot discern how Professor Longan's testimony remains relevant in this case. Accordingly, ICIC's motion to exclude the expert testimony of Professor Longan is denied as moot.

## III. Motions for Summary Judgment

Plaintiff contends that the conduct of ICIC, Briggs, and Hyken gives rise to claims for (1) negligent and/or bad faith failure to settle; (2) breach of fiduciary duty; (3) breach of duty to provide

a competent defense; and (4) fraud. Plaintiff also seeks punitive damages and attorney fees. ICIC moves for summary judgment as to each of Plaintiff's claims; Plaintiff moves for summary judgment on the negligent and bad faith failure to settle and breach of fiduciary duty claims.[8] The parties appear to agree that Georgia law governs this case.

### A.   Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial." *Id.* at 322.

---

[8]ICIC also filed a motion to strike portions of the affidavit of Ralph Perales for purposes of the pending motions for summary judgment. ICIC contends that Perales's affidavit contravenes Federal Rule of Civil Procedure 56(e), which requires affidavits supporting or opposing a motion for summary judgment to "be made on personal knowledge," "be admissible in evidence," and "show that the affiant is competent to testify on matters stated." Fed. R. Civ. P. 56(e)(1). ICIC contends that Perales's affidavit contains inadmissible hearsay, speculation, and testimony directly contradicting his deposition testimony. Because the Court did not rely on any inadmissible evidence contained in Perales's affidavit when deciding the pending motions, ICIC's motion to strike is denied as moot.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his . . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (internal quotation marks and citation omitted).

B.  Analysis of Plaintiff's Claims

1.  *Negligent or Bad Faith Failure to Settle*

Each party seeks summary judgment on Plaintiff's claim for negligent or bad faith failure to settle the Underlying Claim.

25

Plaintiff contends that ICIC acted unreasonably by failing to respond to Perales's settlement-related communications, including the April 8, May 21, and June 27 Letters.[9]  ICIC contends that throughout its handling of Lucio-Anaya's claim, it continually attempted to effectuate settlement, but these attempts were intentionally thwarted by Rosner and Perales.[10]  The Court finds that the existence of

---

[9]The June 27 Letter demanded two million dollars in settlement.  The Court observes that the Georgia Supreme Court has expressly "disapprove[d] of . . . placing an affirmative duty on the [insurer] to engage in negotiations concerning a settlement demand that is in excess of the insurance policy's limits."  *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 686, 580 S.E.2d 519, 522 (2003)

[10]ICIC also argues that (1) Plaintiff's claims arise in contract only and (2) Plaintiff's claims are barred by the doctrine of exhaustion of policy limits.  It is clear that under Georgia law, Plaintiff may sustain tort claims for bad faith and negligent failure to settle.  *See, e.g., Brightman*, 276 Ga. at 684, 580 S.E.2d at 521.  ICIC, however, argues that these cases are distinguishable because they seem to require that the insurer affirmatively "refuse" to settle a case.  Because ICIC attempted to effectuate settlement throughout this case, ICIC contends that it never refused to settle and chose to try the Underlying Action.  ICIC's argument cannot be squared, however, with the fact that Georgia courts permit a cause of action for "negligent" failure to settle.  *See, e.g., id.; c.f. also Firemen's Ins. Co. of Newark, N.J. v. Allmond*, 105 Ga. App. 763, 766-67, 125 S.E.2d 545, 548 (1962) ("Where an insured has suffered a loss and the company has notice thereof, unless a bona fide effort is made to effect a settlement of the loss in accordance with the provisions of the policy, there is an absolute refusal to pay . . . .").  This claim therefore lacks merit.

To the extent ICIC contends it no longer had a duty to defend Lucio-Anaya—although it continued to do so in good faith—because it had already exhausted its policy limits, its contention is similarly without merit.  Hyken unsuccessfully attempted to settle with Aguilera after the Underlying Action was filed.  Hyken later notified Aguilera that ICIC would exhaust the policy limits by offering the remaining $15,000 of coverage to Ms. Hanson.  When Aguilera still declined to settle, ICIC exhausted its policy limits by settling the Hanson claim.  Georgia courts have held that "[a] liability insurer may, in good faith and without notification to others, settle part of multiple claims against its insured even though such settlements deplete or exhaust the policy limits so that remaining claimants have no recourse against [the] insurer."  *Allstate Co. v. Evans*, 200 Ga. App. 713, 714, 409 S.E.2d 273, 274 (1991) (internal quotation marks and citation omitted) (alterations in original).  In this

26

genuine issues of material fact precludes summary judgment in favor of either party.

Under Georgia law, "[a]n insurance company may be liable for the excess judgment entered against its insured based on the insurer's bad faith or negligent refusal to settle a personal claim within the policy limits." *Cotton States Mut. Ins. Co. v. Brightman*, 276 Ga. 683, 684, 580 S.E.2d 519, 521 (2003). An insured may bring a suit for negligent or bad faith failure to settle "when the insurer had a duty to settle the case, breached that duty, and its breach proximately caused damage to the insured beyond the damages, if any, contemplated by the insurance contract." *Delancy v. St. Paul Fire & Marine Ins. Co.*, 947 F.2d 1536, 1546-47 (11th Cir. 1991) (applying Georgia law). Permitting a bad faith claim under these circumstances ensures "that the insurer '[does] not gamble' with the funds of its insured by refusing to settle within policy limits." *Id.* at 1547 (quoting *McCall v. Allstate Ins. Co.*, 251 Ga. 869, 870, 310 S.E.2d 513, 515 (1984)).

Georgia law imposes a duty on the insurer to "give equal consideration to the interests of the insured" when deciding whether

case, however, at the time Plaintiff contends that ICIC negligently refused to settle, the policy limits had not yet been exhausted. Thus, ICIC still had a duty to defend Lucio-Anaya. Moreover, once ICIC decided to defend Lucio-Anaya, it owed Lucio-Anaya the duty to defend him in good faith. *Cf., e.g., Ponse v. Atlanta Cas. Co.*, 254 Ga. App. 641, 644, 563 S.E.2d 499, 502 (2002) ("[W]here one undertakes an act which he has no duty to perform and another reasonably relies on that undertaking, the act must generally be performed with ordinary or reasonable care." (quoting *Stelts v. Epperson*, 201 Ga. App. 405, 407, 411 S.E.2d 281, 282 (1991)).

to settle a claim within the policy limits. *S. Gen. Ins. Co. v. Holt*, 262 Ga. 267, 268, 416 S.E.2d 274, 276 (1992). The insurer's conduct is "[j]udged by the standard of the ordinarily prudent insurer," and the insurer may be negligent "if the ordinarily prudent insurer would consider choosing to try the case created an unreasonable risk." *Brightman*, 276 Ga. at 685, 580 S.E.2d at 521. "In determining whether the insurer has breached its duty to its insured to settle, a factual issue is sometimes presented concerning whether the insurer had an opportunity to make an effective compromise." *Id.* Under such circumstances, a "jury generally must decide whether the insurer, in view of the existing circumstances, has accorded the insured 'the same faithful consideration it gives its own interest.'" *Holt*, 262 Ga. at 268-69, 416 S.E.2d at 276.

ICIC contends that Perales never had any intention of settling Aguilera's claim, and instead he sent the May 21 Letter to "'set up' [ICIC] for an excess judgment merely by offering to settle within the policy limits and by imposing an unreasonably short time within which the offer would remain open." *Id.* (internal quotation marks and citation omitted). The May 21 Letter may have had its shortcomings—it was allegedly addressed incorrectly, omitted some important claims-related information, and contained a short deadline which was set to expire on a national holiday. However, as described above, the May 21 Letter was not Perales's only effort to settle the Underlying Action on behalf of his client. ICIC's own witnesses

testified that the April 8 Letter presented at least an opportunity to negotiate a settlement on behalf of the insured. (*See, e.g.,* Sharp Dep. 37:23-38:6, Feb. 14, 2008.) The circumstances thus present "a factual issue . . . concerning whether the insurer had an opportunity to make an effective compromise[,]" *Brightman*, 276 Ga. at 685, 580 S.E.2d at 521, particularly in light of ICIC's acknowledgment of the seriousness of Moreno's injuries and the comparatively low policy limit, *see, e.g., Kingsley v. State Farm Mut. Auto Ins. Co.*, 353 F. Supp. 2d 1242, 1252 (N.D. Ga. 2005), *aff'd* 153 F. App'x 555 (11th Cir. 2005) (holding that in order for duty to settle to attach, there must exist "some certainty regarding the settlement posture of the parties in the underlying lawsuit—i.e., where the insured's liability is clear, the damages are great, *and* the insurer is on notice that it has an opportunity to settle the case").

ICIC next argues that Plaintiff cannot demonstrate that its alleged breach was the proximate cause of the failure to settle the Underlying Claim. ICIC contends that Barnes's failure to respond to Perales could not have resulted in a settlement because at the time Perales wrote the April 8 and May 21 Letters, Perales did not have the authority to settle on behalf of Aguilera. The record, however, reveals at least a fact question as to whether Barnes believed Perales had the apparent authority to bind his client to a settlement. Under Georgia law, "[a]n attorney has apparent authority

to enter into a settlement agreement on behalf of a client; and the client will be bound by such agreement, even in the absence of express authority, where the opposite party is unaware of any limitation on the attorney's authority." *See, e.g., Deveraux v. Citizens & S. Nat'l Bank*, 172 Ga. App. 53, 53, 322 S.E.2d 310, 310 (1984). Perales testified that his phone messages, which Barnes admitted she received, referred to discussing a settlement of the case. (*See, e.g.,* Perales Dep. 113:18-25, 115:4-11, Oct. 4, 2007.) The April 8 Letter also suggests that Barnes knew a guardian had been appointed and that the settlement could therefore be finalized. (Pl.'s Ex. 5.) At a minimum, factual issues exist as to whether Barnes believed Perales had the authority to enter into a settlement on behalf of his client prior to the deadline set forth in the May 21 Letter. In sum, factual issues "concerning whether the insurer had an opportunity to make an effective compromise" remain in this case, and summary judgment is therefore inappropriate as to Plaintiff's negligent or bad faith failure to settle claims. *Brightman*, 276 Ga. at 685, 580 S.E.2d at 521.

### 2. Breach of Fiduciary Duty

Each party also seeks summary judgment on Plaintiff's claims for breach of fiduciary duty. "It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." *Griffin v. Fowler*, 260 Ga.

App. 443, 445, 579 S.E.2d 848, 850 (2003). The Court finds that summary judgment in ICIC's favor is appropriate on Plaintiff's breach of fiduciary duty claims because Plaintiff cannot establish that ICIC should be held vicariously liable for any breach of fiduciary duty by Briggs and Hyken.[11]

It is beyond dispute that attorneys owe their clients "fiduciary duties to show loyalty, to exercise the utmost good faith, to apply [their] best skill, zeal, and diligence in representing [them], and to avoid interests or actions that [are] incompatible" with their clients' interests. *Tunsil v. Jackson*, 248 Ga. App. 496, 499, 546

---

[11]Plaintiff also alleges that ICIC stands in a fiduciary relationship with Lucio-Anaya; Defendant responds that Georgia law categorically holds that no fiduciary relationship exists between the insurer and its insured. The general rule in Georgia is that "[a] fiduciary relationship does not exist between an insurer and its insured." *Clark v. Byrd*, 254 Ga. App. 826, 827, 564 S.E.2d 742, 744 (2002). However, the general rule is typically applied only when an insured makes a claim against his own insurer since such a claim "is one of antagonistic interests." *Id.* (internal quotation marks and citation omitted). In contrast, when an insurer is handling a third-party claim on behalf of its insured, Georgia courts recognize "somewhat of a fiduciary" relationship between the parties. *U.S. Fid. & Guar. Co. v. Evans*, 116 Ga. App. 93, 95, 156 S.E.2d 809, 811 (1967). Because of this relationship, "[w]here an insurer violates its fiduciary duty to its insured and puts its interests superior to its insured, such conduct may be found to be tortious, either negligent or bad faith." *Thomas v. Atlanta Cas. Co.*, 253 Ga. App. 199, 205, 558 S.E.2d 432, 439-40 (2002).
    The Court therefore finds that while ICIC was handling Lucio-Anaya's claim, it simply owed Lucio-Anaya the duty to accord Lucio-Anaya's interests the same consideration as its own. *Evans*, 116 Ga. App. at 95, 156 S.E.2d at 811. In this case, however, the Court cannot discern how any alleged breach of fiduciary duty committed by ICIC does not merely duplicate Plaintiff's claim that ICIC failed to settle the Underlying Claim, either negligently or in bad faith. Thus, the Court finds it unnecessary to define the contours of any "fiduciary" relationship that exists between an insurer and an insured under the laws of Georgia. Moreover, as discussed more thoroughly below, ICIC cannot be held vicariously liable for any alleged breach of fiduciary duty committed by Briggs or Hyken.

S.E.2d 875, 878 (2001).  In short, "[a] lawyer should always act in a manner consistent with the best interests of his client." *Paul v. Smith, Gambrell & Russell*, 267 Ga. App. 107, 110, 599 S.E.2d 206, 209 (2004) (internal quotation marks and citation omitted).  Hyken and Briggs were thus bound to act in accordance with Lucio-Anaya's best interests, and Plaintiff contends that evidence in the record suggests that the attorneys fell short of this obligation.

Plaintiff does not sue Hyken and Briggs, however, but asserts that *Smoot v. State Farm Mutual Insurance Company*, 299 F.2d 525 (5th Cir. 1962), stands for the proposition that ICIC can be held vicariously liable for any alleged breach of fiduciary duty by the attorneys it hired.[12]  In *Smoot*, the insured sued its insurer to recover an excess judgment rendered after an automobile accident. 299 F.2d at 527.  The insurer raised the defense that since the excess judgment was "caused by legally culpable neglect or bad faith on the part of the attorney supplied by it to maintain the defense," the insurer should be absolved from liability.  *Id.* at 530.  The insurer argued that its duty to defend its insured was "fulfilled by selecting competent counsel whose acts thereafter are that of one akin to an independent contractor."  *Id.*  The former Fifth Circuit rejected the insurer's contention and held that, under Georgia law,

---

[12]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

"[t]hose whom the Insurer selects to execute its promises, whether attorneys, physicians, no less than company-employed adjusters, are its agents for whom it has the customary legal liability." *Id.*

However, the Georgia Court of Appeals has held that "the unique attorney-client relationship should not be analyzed merely with reference to ordinary agency law." *Plant v. Trust Co. of Columbus*, 168 Ga. App. 909, 909, 310 S.E.2d 745, 746-47 (1983). In *Plant*, the plaintiff alleged that the defendant should be held vicariously liable for the alleged misconduct of the attorney hired by the defendant to enforce the judgment against the plaintiff. *Id.*, 310 S.E.2d at 746. The Georgia Court of Appeals, however, found an insufficient factual basis existed for holding the defendant liable for the tortious acts of its attorney. *Id.*, 310 S.E.2d at 747.

The court first reasoned that the defendant retained the attorney to accomplish a certain result, without prescribing how that result should be accomplished. *Id.*, 310 S.E.2d at 746. Because the defendant "retained no such controls of the details or performance of the attorney's work," the court found that a master-servant or employee-employer relationship did not exist. *Id.* In addition, however, the court found that the plaintiff did not allege that the defendant/client "knew of or ratified the alleged abusive acts of the attorney." The court reasoned:

> A general retention of an attorney to do all things
> necessary to pursue a claim or defense should in legal
> contemplation mean the attorney has authority to do all
> things legal and proper; not otherwise. We will not

> presume a direction or authority or permission to commit a tortious or illegal act inheres in the usual attorney-client relationship.

*Id.*, 310 S.E.2d at 746-47. Without evidence that the defendant knew of the wrongful or tortious acts of its attorney, the court of appeals declined to impose liability upon the defendant. *Id.*, 310 S.E.2d at 747; *see also Gibson v. Casto*, 233 Ga. App. 403, 403, 504 S.E.2d 705, 708 (1998), *aff'd* 271 Ga. 667, 523 S.E.2d 564 (1999) (finding that client was not vicariously liable for the acts of its attorney when attorney testified that he never acted as the agent of the insurer and that he controlled the content of the pleadings filed in the case and the communications between the insured and himself).

Just as in *Plant*, the record before the Court contains an insufficient factual basis for holding ICIC vicariously liable for the allegedly wrongful acts of its attorneys. Although Plaintiff has directed the Court to evidence in the record indicating that ICIC generally authorized and approved Briggs and Hyken's work, (*see, e.g.,* Hyken Dep. 62:7-25, Nov. 14, 2007), this evidence does not demonstrate that ICIC knew of any of the allegedly tortious acts committed by Briggs and Hyken.

> Where the tortious or illegal act alleged is one in which there is no evidence the client expressly or impliedly authorized, knew of, or ratified . . . it cannot be presumed from the mere fact of general retention that the client intended or authorized such act, or that it was 'within the attorney's authority,' to do it.

*Plant*, 168 Ga. App. at 909, 310 S.E.2d at 747. Because Plaintiff has failed to establish that ICIC authorized, knew of, or approved of any

alleged breaches of fiduciary duty of Briggs or Hyken, there is no basis for holding ICIC liable for such breaches. Accordingly, ICIC is entitled to summary judgment on Plaintiff's claim for breach of fiduciary duty.

> 3. *Breach of Duty to Provide Competent Defense*

Plaintiff also alleges that ICIC breached its duty to provide Lucio-Anaya with a competent defense. Without citation to legal authority or the record, Plaintiff contends that hiring Decker Hallman to represent Lucio-Anaya, while knowing that a conflict of interest existed between Lucio-Anaya and ICIC, was a breach of ICIC's duty to provide Lucio-Anaya with a competent defense. (Pl.'s Resp. to Def.'s Mot. for Summ. J. 19.) The Court will not obligate an insurance company to determine whether its insured has a non-waivable conflict of interest with the attorney hired by the insurer to represent him or her. This obligation lies with the attorneys who concurrently represent the interests of the insurer and the insured; indeed, such obligation is set forth in the Georgia Rules of Professional Conduct. *See* Ga. R. Prof. Conduct 1.7 (general rule regarding conflicts of interest). Any remaining claims for breach of the duty to provide a competent defense are foreclosed by the Court's decision in section III.B.2 that ICIC cannot be held vicariously liable for the alleged misconduct of Briggs and Hyken. ICIC is therefore entitled to summary judgment on Plaintiff's claim for breach of duty to provide a competent defense.

*4.   Fraud*

Plaintiff also brings a claim for constructive fraud pursuant to O.C.G.A. § 23-2-51, which defines constructive fraud as "any act of omission or commission, contrary to legal or equitable duty, trust, or confidence justly reposed, which is contrary to good conscience and operates to the injury of another."  The law in Georgia has long been that "'[w]here a person sustains towards (another) a relation of trust and confidence, his silence when he should speak, or his failure to disclose what he ought to disclose, is as much a fraud in law as an actual affirmative false representation.'"  *Arnall, Golden & Gregory v. Health Svc. Ctrs., Inc.*, 197 Ga. App. 791, 793, 399 S.E.2d 565, 567 (1990) (quoting *Morris v. Johnstone*, 172 Ga. 598, 158 S.E. 308, 312 (1931)).  However, a "[d]uty to disclose is not . . . the only element that must be shown to establish constructive fraud."  *Eason Publ'ns, Inc. v. Nationsbank of Ga.*, 217 Ga. App. 726, 730, 458 S.E.2d 899, 903 (1995).  Plaintiff must demonstrate the remaining elements of a fraud cause of action, including detrimental reliance.  *See id.*  In this case, the Court finds that Plaintiff cannot sustain a claim for constructive fraud.  Even assuming a jury believes that Barnes, Briggs, and Hyken intentionally concealed the existence of his bad faith claim, Plaintiff fails to explain how Lucio-Anaya relied on this conduct to his detriment.  On the present record, ICIC is therefore entitled to summary judgment on Plaintiff's fraud claims.

5.    *Attorney Fees and Punitive Damages*

Plaintiff seeks attorney fees and costs pursuant to O.C.G.A. § 13-6-11 because ICIC "acted in bad faith in the underlying transaction, has been stubbornly litigious and has caused the Plaintiff unnecessary trouble and expense." (First Am. Compl. ¶ 77.) In addition, Plaintiff seeks punitive damages, arguing that ICIC's conduct was "done intentionally, fraudulently, with a conscious disregard of the rights of Mr. Lucio-Anaya, and knowing there was a substantial certainty of financial harm to him." (*Id.* ¶ 86.)  ICIC argues that Plaintiff has directed the Court to insufficient record evidence to permit these issues to survive summary judgment.  The Court disagrees.

i.    ATTORNEY FEES

In Georgia, each party to a lawsuit bears his or her own costs of litigation unless a contract or statute provides otherwise. *Harrison v. Harrison*, 208 Ga. 70, 70, 65 S.E.2d 173, 174 (1950). Georgia law provides that a plaintiff may recover litigation expenses, including an award of attorney fees, "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. While any of these three grounds are sufficient for such an award, "[w]hen a bona fide controversy exists between the parties, a plaintiff cannot cite stubborn litigiousness or unnecessary trouble and expense as proper grounds for awarding attorney fees." *Marshall*

*v. King & Morgenstern*, 272 Ga. App. 515, 522, 613 S.E.2d 7, 13 (2005) (footnote omitted).

Based on a review of the present record, it is clear that a bona fide controversy exists. Therefore, in order to support an award of attorney fees, Plaintiff must show that ICIC acted in bad faith with respect to the underlying transaction giving rise to the litigation—in this case, the Underlying Claim and the Underlying Action. *See, e.g., Sass v. First Nat. Bank of Cherokee*, 228 Ga. App. 7, 7, 491 S.E.2d 76, 77 (1997). The Court has found that summary judgment is inappropriate as to Plaintiff's bad faith failure to settle claim. Under Georgia law, "'[e]very intentional tort invokes a species of bad faith and entitles a person so wronged to recover the expenses of litigation including attorney fees.'" *Bunch v. Byington*, ___ S.E.2d ___, No. A08A0583, 2008 WL 2635558, at *6 (Ga. Ct. App. July 7, 2008) (internal quotation marks and citation omitted). ICIC's motion for summary judgment is thus denied to the extent Plaintiff seeks attorney fees.

### ii. PUNITIVE DAMAGES

Georgia law authorizes the imposition of punitive damages "only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." O.C.G.A. § 51-12-5.1(b). However, "[s]omething more

than the mere commission of a tort is necessary for the imposition of punitive damages. Negligence alone, even gross negligence, is insufficient to support punitive damages." *MDC Blackshear, LLC v. Littell*, 273 Ga. 169, 173, 537 S.E.2d 356, 361 (2000) (footnote omitted).

"Whether a defendant's actions are wilful, wanton, or evince an entire want of care as to authorize punitive damages by clear and convincing evidence under O.C.G.A. § 51-12-5.1(b) is normally an issue for consideration by a jury." *Keith v. Beard*, 219 Ga. App. 190, 194, 464 S.E.2d 633, 638 (1995). Under Georgia law, "the alleged tortious conduct of [the insurer] may be found to have resulted in a judgment against [the plaintiff] in excess of her policy limits, which constitutes pecuniary damages necessary to support punitive damages." *Thomas*, 253 Ga. App. at 205, 558 S.E.2d at 440. The Court therefore denies ICIC's motion for summary judgment to the extent Plaintiff seeks punitive damages.

CONCLUSION

In sum, the Court makes the following rulings:

1.    Defendant's Motion for Summary Judgment (Doc. 75) is granted as to Plaintiff's claims for breach of fiduciary duty, breach of the duty to provide a competent defense, and fraud but denied as to Plaintiff's claims for bad faith and/or negligent failure to settle.

2.    Plaintiff's Motion for Partial Summary Judgment (Doc. 76) is denied in its entirety.

3.    Plaintiff's Motion to Partially Exclude Expert Testimony of J. Robert Persons (Doc. 98) is granted in part and denied in part.

39

4. Defendant's Motion in Limine to Limit Expert Witness Testimony of Dr. Tim Ryles (Doc. 102) is granted in part and denied in part.

5. The Court defers ruling on Defendant's Motion to Exclude Witness Testimony of Ben Philips (Doc. 103) until a *Daubert* hearing can be held.

6. Defendant's Motion to Exclude/Limit Expert Witness Testimony of Patrick Longan (Doc. 104) is denied as moot.

7. Defendant's Notice of Objection to or, in the Alterative, Motion to Strike the Affidavit of Ralph Perales (Doc. 106) is denied as moot.

8. Defendant's Motion for Leave to File Amended Answer (Doc. 107) is denied.


IT IS SO ORDERED, this <u>8th</u> day of <u>August</u>, 2008.


<u>        /S/  Clay D. Land        </u>
CLAY D. LAND
UNITED STATES DISTRICT JUDGE